IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEW JERSEY

| | |
|---|---|
| THOMAS POLLARD, | HONORABLE JEROME B. SIMANDLE |
| Plaintiff, | CIVIL NO. 07-0239 (JBS) |
| v. | |
| MICHAEL J. ASTRUE, COMMISSIONER OF SOCIAL SECURITY ADMINISTRATION, | **OPINION** |
| Defendant. | |

APPEARANCES:

Robert A. Petruzzelli, Esquire
Jacobs, Schwalbe & Petruzzelli, Attorneys at Law
10 Melrose Ave., Suite 340
Cherry Hill, NJ 08003
      Attorney for Plaintiff

Christopher J. Christie
UNITED STATES ATTORNEY
      By:  Tomasina DiGrigoli
            Special Assistant United States Attorney
Social Security Administration
Office of the General Counsel
26 Federal Plaza, Suite 3904
New York, NY 10278
      Attorney for Defendant

**SIMANDLE**, District Judge:

This matter comes before the Court pursuant to Section 205(g) of the Social Security Act, as amended, 42 U.S.C. § 405(g) (2006), to review the final decision of the Commissioner of the Social Security Administration denying the application of Claimant Thomas Pollard ("Mr. Pollard or "Claimant") for Disability Insurance Benefits ("DIB") and Supplemental Security

Income ("SSI") under Title II and Title XVI of the Social Security Act.  See 42 U.S.C. §§ 401-34 (2006).  He filed for DIB and SSI benefits on September 22, 2003, alleging his disability onset date as September 15, 2002, due to blindness in one eye, diabetes and high blood pressure.  (R. at 80.)  Claimant urges this Court to vacate the administrative decision and remand the case to the Commissioner for an award of benefits.

At issue in this case is whether there is substantial evidence in the record to support the Administrative Law Judge's ("ALJ") determination that Claimant's impairments are not severe enough to qualify him as "disabled" under the Social Security Act.  This Court must determine whether the ALJ properly evaluated the severity of Claimant's impairments by considering and weighing all the medical and non-medical evidence in the record, as well as assessing the credibility of Claimant's subjective complaints.

The Court has considered the submissions of the parties pursuant to Local Civil Rule 9.1.  Because the ALJ's decision fails to adequately consider Claimant's fatigue, a symptom related limitation of his impairments, and the accompanying medical evidence in support of it, the Court shall remand to the ALJ to reconsider his reasoning, perform a proper evaluation, and provide adequate explanations.

I.   **STANDARD OF REVIEW**

   A.   **Standard for Judicial Review**

   Under 42 U.S.C. § 405(g), Congress provided for judicial review of the Commissioner's decision to deny a claimant's application for Disability Insurance Benefits.  See Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995).  A reviewing court must uphold the Commissioner's factual decisions where they are supported by "substantial evidence."  42 U.S.C. §§ 405(g), 1383(c)(3); Fargnoli v. Massanari, 247 F.3d 34, 38 (3d Cir. 2001).  Substantial evidence means more than "a mere scintilla." Richardson v. Perales, 402 U.S. 389, 401 (1971) (quoting Consolidated Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  It means "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion."  Id.  The inquiry is not whether the reviewing court would have made the same determination, but whether the Commissioner's conclusion was reasonable.  See Brown v. Bowen, 845 F.2d 1211, 1213 (3d Cir. 1988).  Indeed, the "substantial evidence standard is deferential and includes deference to inferences drawn from the facts if they, in turn, are supported by substantial evidence."  Shaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).

   A reviewing court has a duty to review the evidence in its totality.  See Daring v. Heckler, 727 F.2d 64, 70 (3d Cir. 1984). "[A] court must 'take into account whatever in the record fairly

3

detracts from [a particular piece of evidence's] weight.'"
Schonewolf v. Callahan, 972 F. Supp. 277, 284 (D.N.J. 1997)
(quoting Willbanks v. Sec'y of Health & Human Servs., 847 F.2d
301, 303 (6th Cir. 1988) (quoting Universal Camera Corp. v. NLRB,
340 U.S. 474, 488 (1951))).

The ALJ has a duty "to develop the record fully and
fairly."[1]  Thompson v. Sullivan, 878 F.2d 1108, 1110 (8th Cir.
1089).  The ALJ must set out a specific factual basis for each
finding.  Baerga v. Richardson, 500 F.2d 309 (3d Cir. 1974),
cert. denied, 420 U.S. 931 (1975); Boot v. Heckler, 618 F. Supp.
76, 79 (D. Del. 1985).  Simply referring to the "record" is
insufficient.  Abshire v. Bowen, 662 F. Supp. 8 (E.D. Pa. 1986).
Additionally, the ALJ "must adequately explain in the record
[the] reasons for rejecting or discrediting competent evidence,"
Ogden v. Bowen, 677 F. Supp 273, 278 (M.D. Pa. 1987) (citing
Brewster v. Heckler, 786 F.2d 581 (3d Cir. 1986)), including

---

[1] If, on remand, the ALJ determines that Claimant is
disabled, he must also determine Claimant's disability onset
date.  Although Claimant alleges that he became disabled on
September 15, 2002, there is scant medical evidence in the record
prior to that period.  Indeed, the bulk of the medical evidence
in the record is from 2003 onward.  Although the scarcity of
medical evidence for a particular period of time can be used to
support an ALJ's determination that a claimant's impairment did
not reach disabling severity until a later date, Ricci v. Apfel,
159 F. Supp. 2d 12, 18 (E.D. Pa. 2001), courts have recognized
that in cases of chronic impairments, the paucity of medical
evidence is not necessarily dispositive, especially where
subsequent medical evidence suggests the condition is disabling.
See Schultz v. Bowen, 1988 WL 124627, *1, *3 (E.D. Pa. 1988).

medical evidence and all non-medical evidence presented.  Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 122 (3d Cir. 2000).

The Third Circuit has held that access to the Commissioner's reasoning is indeed essential to a meaningful court review:

> Unless the [Commissioner] has analyzed all evidence and has sufficiently explained the weight he has given to obviously probative exhibits, to say that his decision is supported by substantial evidence approaches an abdication of the court's duty to scrutinize the record as a whole to determine whether the conclusions reached are rational.

Gober v. Matthews, 574 F.2d 772, 776 (3d Cir. 1978).  A district court is not "empowered to weigh the evidence or substitute its conclusions for those of the fact-finder."  Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992).  However, an ALJ need not explicitly discuss every piece of relevant evidence in his or her decision.  See Fargnoli, 247 F.3d at 42.

In a Title II case, the claimant has the burden of producing medical and other evidence necessary to establish disability.  In a Title XVI case, the Commissioner is expected to secure sufficient evidence to make a "sound determination," Ferguson v. Schweiker, 765 F.2d 31, 36 n.4 (3d. Cir. 1985).  The ALJ has this obligation even when the claimant is represented by counsel.  Boyd v. Sullivan, 960 F.2d 733, 736 (8th Cir. 1992).  Claimant seeks benefits under both Titles in this case.

5

B.      **Standard for Disability Insurance Benefits under**
        **Titles II and XVI of the Social Security Act**

The Social Security Act defines "disability" for purposes of entitlement to DIB and SSI benefits as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months."  42 U.S.C. §§ 423(d), 1382c(a)(3)(B) (2006).  Under this definition, "a claimant qualifies as disabled only if [that claimant's] physical or mental impairments are of such severity that [the claimant] is not only unable to do his [or her] previous work, but cannot, considering [the claimant's] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy. . ."  42 U.S.C. §§ 423(d)(2)(A), 1382c(a)(3)(B) (2006).  Impairments must be considered in combination when making disability determinations. Burnam v. Schweiker, 682 F.2d 456, 458 (3d. Cir. 1982).

The Commissioner has promulgated regulations for determining disability that require application of a five-step sequential analysis.  20 C.F.R. § 404.1520 (2006).  The analysis is the same for both DIB and SSI claims.  See Barnhart v. Thomas, 540 U.S. 20, 21-24 (2003).  This process is summarized as follows:

1.    If currently is engaged in substantial gainful employment, the claimant will be found "not disabled."

2.    If not suffering from a "severe impairment," the
      claimant will be found "not disabled."

3.    If the severe impairment meets or equals a listed
      impairment in 20 C.F.R. Part 404, Subpart P, Appendix 1
      and has lasted or is expected to last for a continuous
      period of at least twelve months, the claimant will be
      found "disabled."

4.    If able to still perform work done in the past despite
      the severe impairment, the claimant will be found "not
      disabled."

5.    Finally, the Commissioner will consider the claimant's
      ability to perform work, age, education, and past work
      experience to determine whether or not the claimant is
      capable of performing other work which exists in the
      national economy.  If incapable, the claimant will be
      found "disabled."  If capable, the claimant will be
      found "not disabled."

20 C.F.R. § 404.1520(b)-(f).  Entitlement to benefits is

therefore dependent upon finding the claimant is incapable of

performing work in the national economy.

    This five-step process involves a shifting burden of proof.

Wallace, 722 F.2d at 1153.  In the first four steps of the

analysis, the burden is on the claimant to prove every element of

his claim by a preponderance of the evidence.  Id.  In the final

step, the Commissioner bears the burden of proving that work is

available for the claimant: "Once a claimant has proved that he

is unable to perform his former job, the burden shifts to the

Commissioner to prove that there is some other kind of

substantial gainful employment he is able to perform."  Kangas v.

Bowen, 823 F.2d 775, 777 (3d Cir. 1987) (citing Chicager v.

Califano, 574 F.2d 161 (3d Cir. 1978)).  In Singletary v. Bowen,

7

798 F.2d 818 (5th Cir. 1986), the Fifth Circuit held that a determination of substantial gainful employment requires a finding that the claimant would be able to "hold whatever job he has for a significant period of time."  Id. at 822.

## II.  BACKGROUND

### A.  Procedural History

On September 22, 2003, Claimant filed applications for Disability Insurance Benefits and Social Security Insurance Benefits (R. at 67-69, 247-49) alleging disability due to diabetes, blindness in one eye, and high blood pressure (R. at 87).  The SSA denied both applications initially (R. at 28-29) and on reconsideration (R. at 30-35, 38-41, 251-55).  Claimant subsequently filed a Request for an Administrative Hearing, (R. at 42-43), which was held on August 10, 2006 (R. at 256-86).  Mr. Pollard, who was represented by counsel, testified at the hearing.  (R. at 11.)  Mr. Pollard's sister, Bertha Hyman, and Ted Montegna, an impartial Vocational Expert ("VE") also testified at the hearing.  (R. at 11.)

### B.  ALJ's Findings

On September 21, 2006, ALJ Daniel W. Shoemaker, Jr. issued a decision ruling that Claimant was not entitled to DIB or SSI because he was not disabled.  (R. at 8-25.)  The ALJ noted that Claimant was not engaged in substantial gainful activity since his alleged date of disability, September 15, 2002.  (R. at 24.)

He found that although Claimant suffers from limited left eye vision and mild mental retardation, impairments that are severe, these impairments did not meet or equal any of the impairments listed in Appendix 1, Subpart P, Regulations as set forth in 20 C.F.R. §§ 404.1521 and 416.921. (Id.) He further found that Claimant's allegations with regard to his limitations were not entirely credible. (Id.) The ALJ next determined that Claimant retained the Residual Functional Capacity ("RFC") to perform the exertional demands of light work as is set forth in 20 C.F.R. §§ 404.1567 and 416.967. (Id.) However, the ALJ acknowledged that Claimant's ability to perform light work is limited in that he can only lift/carry ten pounds frequently and twenty pounds occasionally, walk for six hours in an eight-hour workday, stand for six hours in an eight-hour workday, and sit for six hours in an eight-hour workday. (Id.) He also determined that Claimant is restricted to work that involves simple, repetitive tasks and simple instructions in a low stress environment, which takes into consideration his lack of left eye vision. (Id.) Finally, the ALJ concluded that because Claimant's past work as a security guard did not require the performance of any functions precluded by his impairments, such impairments did not prevent him from performing his past relevant work as a security guard (id.), nor would they prevent him from performing other work that exists in significant numbers in the national economy (R. at 23).

9

Therefore, the ALJ determined that, at Steps Four and Five, Claimant was not disabled.

Claimant requested review by the Appeals Council on September 26, 2006 (R. at 8-25), which denied the request for further review on November 9, 2006 (R. at 4-6).  The ALJ's decision therefore became the final decision of the Commissioner. On January 16, 2007, Plaintiff timely filed the present action with this Court, seeking review of the Commissioner's determination.  [Docket Item No. 1.]

**C.    Evidence in the Record**

**1.    Claimant's Testimony**

Claimant, who was fifty-three years old at the time of the administrative hearing in August 2006, lives with his friend in an apartment in Salem, New Jersey. (R. at 249, 251.)  He testified that he is five feet and three inches tall[2], approximately 230 pounds, and right-handed.  (R. at 260-61.)

Mr. Pollard completed high school and is able to write in cursive and perform simple addition and subtraction.  (R. at 261-62.)  Although Mr. Pollard testified that he is able to read, he also said he has difficulty reading because of his eyesight. (R. at 261.)  Regarding his employment history, he served in the Army as a cook, sometimes lifting heavy pots, and he also drove and

_____

[2] The ALJ noted that Mr. Pollard's medical records state that he is 5'6," to which Mr. Pollard responded that he is uncertain of his height. (R. at 261).

loaded tanks.  (R. at 262, 277.)  He then was employed from 1979 to 2001 in construction as a laborer, during which time he mixed concrete, performed sidewalk work, electrical work, pipe work, road work and landscaping.  (R. at 263, 277.)

Mr. Pollard testified that he last worked on September 2, 2002, at which time he was employed as a security guard at DuPont, where he had worked for a year. (R. at 262.)  The record is unclear whether Mr. Pollard left the job because he was laid off or because his contract ended.  (R. at 262-63, 281.)  Mr. Pollard further testified that had his job not been terminated, he is unsure whether he would have continued to work there, because he was having problems with his blood pressure.  (R. at 263.)  He said his job as a security guard consisted of riding around with someone looking for unusual things or standing in the post house. (R. at 275.)  Mr. Pollard also stated that he did not mind working and never had a problem working until his current impairments began.[3]  (R. at 277.)

Mr. Pollard testified that a typical day for him is "terrible," because "[he] [is] hurting all over" and is "dizzy." (R. at 264.)  His daily activities consist of walking around the house, sleeping most of the time, eating cereal and occasionally cooking.  (Id.)  Mr. Pollard claims that he does not drive a car

_____

[3] Mr. Pollard's alleged date of disability onset is September 15, 2002, almost two weeks after he left DuPont.  (R. at 11.)

11

anymore, but admits that he sometimes might try to drive to the store, although never at night because he cannot see.  (R. at 264.)  Although Claimant testified he is able to clean, sweep and vacuum, he also said it would take him a long time, so he normally waits until his sister or roommate can help him.  (Id.)  His roommate also does his laundry and goes shopping for him.  (R. at 264-65.)  Mr. Pollard stated that while his roommate is at work from 8:00 - 3:00 daily, he takes care of himself or travels eight miles to his mother's house by public transportation.  (R. at 265.)  Occasionally, Mr. Pollard attends church in Philadelphia with his mother, although he doesn't sit through the entire service.  (R. at 66-67.)  However, he hasn't gone to church recently, because his mother hasn't been going.  (R. at 267.)

His hobbies consist of watching TV, particularly Judge Matthews and other court shows.  (R. at 267.)  He feels that he can follow what is going on and is able to understand the judge's reasoning, if he doesn't fall asleep during the show.  (R. at 267.)  Mr. Pollard used to enjoy fishing, but he no longer goes fishing due to the fact that he is preoccupied with his problems and does not want to be around anyone.  (R. at 266.)  He also feels that he no longer gets along well with other people.  (Id.)  Claimant testified he is not being treated for depression, but feels that he needs treatment, although he is unsure where to go.

12

(R. at 271.)  Claimant feels he is not doing well and assumes that his depression stems from his inability to do anything. (Id.)

With regard to his aches and pains, Mr. Pollard testified that he gets headaches off and on and aches in his right eye. (R. at 267-68).  He also gets cramps in his fingers when he lifts things or tries to grip an object and in the side of his back if he remains in one position for too long or reaches around to his right side.  (R. at 267, 269, 276.)  Mr. Pollard claimed that he has difficulty standing for more than ten to fifteen minutes, because his back begins to ache.  (R. at 270.)  Similarly, standing too long also causes pain on the side of his right foot, near his ankle.  (Id.)  He claims that this type of pain began recently and he has not yet seen a doctor to discuss it.  (Id.)

Additionally, Mr. Pollard testified that he can only walk approximately twenty-five yards before walking becomes a problem. (R. at 273).  He can also only stand for fifteen to twenty minutes before he has to lean on something. (Id.)  He finds walking down steps especially difficult, due to the fact that one leg will not bend very much.  (Id.)  He claims that if he's sitting, he will fall asleep.  (Id.)  He also mentioned having difficulty sleeping at night, in that he wakes up every two hours or so. (R. at 274.)  He believes he gets approximately three to four hours of sleep per night and usually sleeps a total of four

to six hours during the day. (R. at 284.)   Finally, Mr. Pollard estimated that he can only lift and carry five pounds.  (R. at 273-74.)  When asked by the ALJ if he could manage to carry a gallon of milk, Mr. Pollard responded, "I couldn't go nowhere with it."  (R. at 274.)

With regard to his eyesight, Mr. Pollard stated that he is blind in his left eye, and has been so for four to five years. (R. at 268.)  He further stated that his vision in his left eye was better during the time he was a security guard for DuPont than it is currently.  (Id.)  He also testified that his eye problems never kept him from working, but claims that his peripheral vision is much worse now than it was at that time. (Id.)  When asked by the ALJ whether his present eyesight would allow him to perform the job of security guard well, he responded that "[he] wouldn't want to do it," because due to his loss of peripheral vision, "[he'd] be seeing things that aren't even there." (Id.)  He claims that he visits his eye doctor every six months for check-ups.  (R. at 269.)

With regard to his hearing, Mr. Pollard stated that everyone comments that he keeps his TV on loud, but that he has never had his hearing checked out.  (R. at 274.)

Mr. Pollard testified that he has had diabetes for three or four years and is presently taking Glucovance.[4]  (R. at 270.)

---

[4]  Glucovance is also known as glyburide.  (R. at 272.)

14

Claimant testified his doctor wanted him to take insulin injections, because the pills are no longer working, Mr. Pollard is afraid of needles, and thus does not want to use them.  (Id.) In addition to Glucovance, Mr. Pollard takes Lotrel, for blood pressure, which he claims is elevated, and Avandian and Lipitor for cholesterol. (R. at 272.)  He claims that he suffers dizziness as a side effect of these medications.  (R. at 273.) He visits his family doctor, Dr. Auerbach, every six months and has used this doctor all of his life.  (R. at 271.)

## 2.   **Claimant's Sister's Testimony**

Claimant's sister, Bertha Hyman, who is forty-seven years old, testified that she sees Mr. Pollard two to three times per week.  (R. at 278.)  She states that she cooks for him and is aware that his roommate does a lot of the vacuuming and physical household chores.  (R. at 279.)  She remembers that when he worked at DuPont, he would complain that his eyes bothered him at times.  (R. at 278.)  She has noticed that when Claimant is walking, his breathing is labored and he needs to rest frequently.  (R. at 279.)  She also testified that his blood pressure is extremely elevated, even with medication,[5] and that he appears to have difficulty hearing her, although she's unsure

---

[5] Ms. Hyman used to work as a nurse and testified that she will check Mr. Pollard's blood pressure at times.  (R. at 279.) She estimated that his blood pressure is 180/110 with medication. (Id.)

whether that's a focus issue or a hearing issue.  (R. at 279-80.)
She's also noticed that Mr. Pollard is not as cheerful as he used
to be, that he sleeps a great deal, that he has trouble lifting
things, and that his eyesight is poor.  (R. at 280.)  Because of
his poor eyesight, she testified that she is uncomfortable being
in a car if he is the driver.  (R. at 280-81.)

### 3.   Vocational Expert's Testimony

The Vocational Expert ("VE") testified that Mr. Pollard's
past relevant work consisted primarily of his construction job as
a laborer and his security job position.  (R. at 281.)  The
laborer position is classified according to the Dictionary of
Occupational Titles ("DOT') as very heavy or heavy, unskilled
work.  (Id.)  The security job is classified as light and
unskilled.  (Id.)  In response to questioning by the ALJ as to
whether Mr. Pollard would be able to perform his past relevant
work as a security guard, taking into account his vision of 20/15
in his right eye, his left eye blindness, and his mild mental
retardation, the VE replied that Mr. Pollard would be able to
perform that job.  (R. at  282.)  He also stated that Mr. Pollard
could perform the job of flagger[6], an unskilled position, of

---

[6]   The job of flagger is defined by the Department of
Transportation as:

> Controls movement of vehicular traffic through
> construction projects: Discusses traffic routing plans,
> and type and location of control points with superior.
> Distributes traffic control signs and markers along

which there are approximately 56,000 in the national economy and 1250 in New Jersey.  (R. at 283.)

In response to cross-examination by claimant's prior counsel, the VE testified that the flagger job required an individual to stand on his feet for the better part of a day and to observe oncoming traffic to make sure that no collisions between cars occurred in the restricted lane.  (R. at 284.)  With regard to questioning concerning whether Mr. Pollard's eyesight would preclude him from performing the security job, the VE stated that he would defer to Mr. Pollard's driver's license. (R. 283.)  If Mr. Pollard was issued a valid driver's license, he did not see an issue with him being unable to perform the security job.  (Id.)  The VE further testified that if four to five hours of sleep occurred during the eight hour work shift, "it would pose a significant deterrent for anyone to perform [the security job] or any job if it occurs on an ongoing daily basis." (R. at 284-85.)  Additionally, he testified that experiencing

_____

site in designated pattern.  Directs movement of traffic though site, using sign, hand, and flag signals.  Warns construction workers when approaching vehicle fails to heed signals to prevent accident and injury to workers.  Informs drivers of detour routes through construction sites.  Records license number of traffic control violators for police.  May give hand marker to last driver in line up of one-way traffic for FLAGGER (construction) at opposite end of site, signaling clearance for reverse flow of traffic.
DOT 372.667-022

dizziness, pain in the ankles and having difficulty standing or walking for more than ten to fifteen minutes at a time would also likely preclude an individual from performing a security guard position, because most guard positions entail standing in a guard post or walking.  (R. at 285.)

### D.   **Medical Records**

#### 1.   **Treating Physicians**

##### a.   **Dr. Allen Auerbach: Primary Care Physician**

Mr. Pollard visited his primary care physician, Dr. Allen Auerbach, numerous times during the years 2001-2005.  (R. at 167-86.)  The medical records establish that Dr. Auerbach continually documented Mr. Pollard's heart problems, diabetes and hypertension and prescribed multiple medications, beginning on October 23, 2001 (R. at 185.)  Dr. Auerbach noted on August 18, 2003 that Mr. Pollard had been out of all of his medications for a week and needed a refill. (R. at 180.)  On two separate dates, September 17, 2003 and November 17, 2003, Dr. Auerbach noted in Mr. Pollard's medical records that he was permanently and totally disabled.  (R. at 173, 178.)

On October 30, 2003, an echocardiogram was performed on Mr. Pollard at Dr. Auerbach's request, which revealed moderate left ventricular hypertrophy[7] and normal left ventricular systolic

_____

[7] Left ventricular hypertrophy describes the enlargement or overgrowth of the middle layer of the left chamber of the heart due to chronic pressure overload.  See Stedman's Online Medical

function,[8] with a left ventricular ejection fraction estimated to be 55-60%. (R. at 188.)  The right ventricular chamber size and systolic function were also normal.  (Id.)  The test further revealed moderate left atrial chamber enlargement, mild trileaflet aortic sclerosis,[9] and mild mitral regurgitation. (Id.)

On November 11, 2003, Mr. Pollard submitted to a treadmill stress test using the Bruce Protocol,[10] also at Dr. Auerbach's request.  (R. at 186.)  He exercised for a total duration of 7:45 minutes and achieved a workload of 9.7 METS (metabolic equivalents), before the test was stopped due to Mr. Pollard achieving the target heart rate and due to his fatigue. (Id.) During the exercise, Mr. Pollard's blood pressure went from 140/84 to 210/70, which was noted as an elevated blood pressure response to the study.  (Id.)  No arrhythmia were noted, and this

---

Dictionary, http://www.stedmans.com.

[8] Left ventricular systolic function describes the contraction of the left ventricle of the heart. (Id.)

[9] Mild trileaflet aortic sclerosis describes an induration or hardening, especially from inflamation of the aorta. (Id.)

[10] Although the Bruce Protocol is a clinical test developed to evaluate patients with suspected coronary disease, it is also used to estimate cardiovascular fitness.  It requires the use of a treadmill, stopwatch and electrocardiograph.  The test is conducted on treadmill moving at 1.7 mph and raised to a gradient of 10%.  At three minute intervals, the gradient increases by 2% and the speed increases according to a specified rate chart.  See Fitness Testing, http://www.topendsports.com/testing/tests/bruce.htm.

was considered a normal treadmill exercise study.  (Id.)  On the
same day, Mr. Pollard also underwent myocardial perfusion
imaging,[11] which revealed a small fixed apical and small fixed
inferior wall defect.  (R. at 187.)  No evidence of ischemia[12]
was detected.  (Id.)  At the time of Mr. Pollard's office visit
on January 10, 2005, Dr. Auerbach stated that Mr. Pollard's
diabetes was uncontrolled.  (R. at 170.)  However, ten days
later, at an office visit on January 19, 2005, Dr. Auerbach noted
that Mr. Pollard's diabetes was improving and his hypertension
was controlled.  (R. at 169.)

### b.   Dr. Fouad K. Michail: Ophthalmologist

On May 26, 2004, Mr. Pollard was evaluated by Dr. Fouad K.
Michail, an ophthalmologist.  (R. at 164.)  The examination
revealed no diplopia[13] in the extraocular muscles and normal

---

[11]  Myocardial perfusion imaging involves producing two-
dimensional images of the distribution of radioactivity in
tissues using a radiotracer that traverses the myocardial
capillary system obtaining immediate and delayed images in order
to assess regional blood flow and cell viability.  See The Free
Dictionary,
http://medical-dictionary.thefreedictionary.com/scintigraphy.

[12] Ischemia is a blood deficiency usually due to functional
constriction or actual obstruction of a blood vessel. See The
Free Dictionary,
http://medical-dictionary.thefreedictionary.com/ischemia.

[13] Diplopia is the perception of two images in a single
object.  See The Free Dictionary,
http://medical-dictionary.thefreedictionary.com/diplopia.

fundi[14] in the right eye, but central retinal artery occlusion and macular scarring in the left eye. (Id.)  Vision was 20/20 in the right eye, with normal field of vision. (Id.)  Mr. Pollard could not see the target with his left eye. (Id.)

### c.  Dr. Layla Kamoun: Opthamologist

On November 2, 2005, Dr. Layla Kamoun performed a diabetic eye examination on Mr. Pollard. (R. at 246.)  Dr. Kamoun found that Mr. Pollard's vision was 20/15 in his right eye and that he was able to see up to a distance of three feet in his left eye. (Id.)  A dilated eye exam revealed normal intraocular pressure and no rubeosis,[15] no retinopathy in the right eye, and old blood and dilated vessels in his left eye which are secondary to central retinal vein occlusion. (Id.)  On May 2, 2006 Mr. Pollard had a follow-up appointment with Dr Kamoun. (R. at 245.)  Based on an eye examination, Dr. Kamoun found Mr. Pollard had 20/15 vision in his right eye and was only capable of seeing enough to count fingers with his left eye. (Id.)  A dilated examination revealed a healthy anterior segment, no diabetic retinopathy in his right eye, and a stable left fundus. (Id.)  At the conclusion

---

[14] Fundi are the bottom or lowest part of a sac or hollow organ.  See Stedman's Online Medical Dictionary, http://www.stedmans.com/section.

[15] A condition characterized by reddish discoloration.  See The Free Dictionary, http://medical-dictionary.thefreedictionary.com/rubeosis

21

of the appointment, Mr. Pollard was prescribed polycarbonate glasses. (Id.)

### 2. **Non-treating Physicians**

#### a. **Dr. Nithyashuba Khona: Internist**

Dr. Nithyashuba Khona performed a consultative examination on Mr. Pollard on February 1, 2005, at the request of the Social Security Administration. (R. at 194.) Dr. Khona noted that Mr. Pollard's chief complaint was chronic fatigue. (Id.) During the visit, Mr. Pollard denied having headaches or chest pain, but stated that he is depressed, sad and does not sleep well. (Id.) He also told the doctor that he does not want to take his medication, but he is fatigued all the time. (Id.)

His blood pressure was 180/88, and his vision was 20/25 in his right eye and 20/0 in his left eye. (Id.) The sclera[16] were anicteric,[17] the conjunctivae[18] clear, and his pupils were slow to react to light and accommodation. (Id.) He was not able to keep his eyes open well and his fundi were not visualized. (Id.) His gait and stance were normal; he was able to walk on his heels and toes and rise from a chair without difficulty, as well as squat

---

[16] Sclera is the fibrous layer forming the outer envelope of the eyeball. See Stedman's Online Medical Dictionary, http://www.stedmans.com/section.

[17] Anicteric means not marked by jaundice.(Id.)

[18] Conjunctivae is the mucous membrane that lines the inner surface of the eyelid and the exposed surface of the eyeball. (Id.)

fully.  (Id.)  He also used no assistive devices, and needed no
help changing for the exam or getting on and off the exam table.
(Id.)  His skin, head, face, ears, nose, throat, neck and abdomen
were all normal.  (R. at 195-96.)  Mr. Pollard's chest and lungs
were clear.  (R. at 196.)  His percussion was normal, as was his
diaphramatic motion.  (Id.)  There was no significant chest wall
abnormality.  (Id.)  There was a full range of motion in his
cervical and lumbar spine, shoulders, elbows, forearms, wrists,
knees and ankles.  (Id.)  His strength was 5/5 in his upper and
lower extremities and his joints were stable and nontender.  (Id.)
There were no evident subluxations,[19] contractures,[20] ankylosis,[21]
thickening, redness, heat, swelling or effusion.  (Id).  There
was also no muscle atrophy evident, nor was there any significant
varicosities or trophic changes.  (Id.)  His hand and finger
dexterity were intact and his grip strength was 5/5 bilaterally.
(Id.)  Dr. Khona further reported that Mr. Pollard was dressed

_____

[19] Subluxation is an incomplete or partial dislocation.  See
The Free Dictionary,
http://medical-dictionary.thefreedictionary.com/subluxations.

[20]  A contracture is an abnormal shortening of muscle
tissue, rendering the muscle highly resistant to passive
stretching.  See The Free Dictionary,
http://medical-dictionary.thefreedictionary.com/contractures.

[21] Ankylosis is the immobility and consolidation of a joint
due to disease, injury or surgical procedure.  See The Free
Dictionary, http://medical-dictionary.thefreedictionary.com/
ankylosis.

appropriately and maintained good eye contact. (Id.)  There was
no evidence of hallucinations, delusions, impaired judgment or
significant memory impairment. (R. at 196-97.)  Mr. Pollard's
affect was normal and he denied suicidal intentions.  (R. 197.)

Dr. Khona diagnosed Mr. Pollard with hypertension, diabetes,
high cholesterol, an enlarged heart and blindness in his left
eye.  (Id.)  Dr. Khona believed that Mr. Pollard has mild to
moderate limitations secondary to his multiple medical conditions
and decreased vision.  (Id.)  He further opined that Mr.
Pollard's fatigue problem could be due to his heart, and further
work-up would be necessary to discover whether there was an
underlying cardiac pathology.  (Id.)  Mr. Pollard refused to
submit to an X-ray of his lumbosacral spine.  (Id.)

       **b.**   **Dr. Hugh D. Moore: Psychologist**

On March 10, 2005, Dr. Hugh D. Moore, a licensed
psychologist, performed both a consultative organicity and
psychiatric evaluation on Mr. Pollard, at the request of the
Social Security Administration.  (R. at 198.)  In the organicity
evaluation, Dr. Moore noted that Mr. Pollard was appropriately
dressed, had good hygiene, normal posture and motor behavior, and
that his eye contact was appropriately focused.  (Id.)  Dr. Moore
found Mr. Pollard to be relaxed and comfortable, and noted that
Mr. Pollard was able to recall and understand instructions.
(Id.)  Mr. Pollard responded to Dr. Moore in a deliberate,

24

orderly, and self-correcting way and worked with reflection and
deliberation.  (Id.)  Dr. Moore found Mr. Pollard's attention and
concentration to be good, and Mr. Pollard did not evidence
significant emotional distress during the session.  (R. at 199-
200.)  After administering verbal and performance IQ tests, using
the WAIS-III, a standardized achievement measure, Dr. Moore
concluded that Mr. Pollard is mildly mentally retarded, and that
his verbal skills are more intact than his performance abilities.
(R. at 200.)  His verbal IQ score was in the 74-84 range and his
performance IQ was in the 60-74 range. (Id.)  Dr. Moore also
administered the WRAT-III, which yielded a score of 100 in the
area of reading/decoding, placing Mr. Pollard's reading level at
the high school level. (Id.)  Mr. Pollard's performance on the
Bender Visual Motor Test suggested no significant weakness within
the domain of perceptual motor integrative functioning.  (Id.)

Dr. Moore diagnosed Mr. Pollard with depressive disorder by
history on Axis I, Mild Mental Retardation on Axis II, and
diabetes, hypertension, and cholesterol on Axis III.  (R. at
201.)  He opined that Mr. Pollard appeared to be capable of
understanding and following simple instructions and directions,
of performing simple and complex tasks with supervision and
independently, and of maintaining attention and concentration for
tasks.  (Id.)  He believed that Mr. Pollard could regularly
attend to a routine and maintain a schedule and is capable of

learning new tasks, making appropriate decisions, relating to and interacting appropriately with others, and managing money.  (R. at 200-201.)  He noted that Mr. Pollard appears to have difficulty dealing with stress.  (R. at 200.)  He further believed that Mr. Pollard's vocational difficulties are caused by medication-induced fatigue, cognitive deficits, lack of motivation, medical problems, and psychiatric symptoms.  (R. at 201.)  He recommended that Mr. Pollard consider neurocognitive rehabilitation to help improve his cognitive deficits. (Id.)

During his psychiatric examination with Dr. Moore, Mr. Pollard reported that he has difficulty sleeping and has experienced symptoms of depression, including hopelessness, fatigue, loss of energy, and problems with memory and concentration.  (R. at 202.)  As for Mr. Pollard's mental status, Dr. Moore noted that Mr. Pollard's speech intelligibility was fluent and that his thought processes were coherent and goal-directed, with no evidence of disordered thinking.  (R. at 203.)  Mr. Pollard's attention and concentration were intact and he was able to count, perform simple calculations, and recite serial numbers in sets of three.  (R. at 204.)  Additionally, his recent and remote memory skills were intact; he was able to recall three objects immediately and after five minutes and restate five digits forward and three digits backward.  (Id.)  Dr. Moore concluded that the examination results were consistent with

psychiatric problems, but that these problems did not appear to be significant enough to interfere with Mr. Pollard's ability to function on a daily basis.  (<u>Id</u>.)  He recommended that Mr. Pollard seek psychiatric treatment.  (R. at 205.)

### c.   <u>Dr. Ed Kamin: Psychological Consultant</u>

Dr. Ed Kamin, a state agency psychological consultant, filled out a psychiatric review technique form evaluating Mr. Pollard on April 8, 2005, based on a review of Mr. Pollard's case file. (R. at 206-20.)  He determined that Mr. Pollard's mental condition did not meet or equal section 12.02[22] or 12.04[23]

---

[22]  12.02 Organic Mental Disorders:  Psychological or behavioral abnormalities associated with a dysfunction of the brain. History and physical examination or laboratory tests demonstrate the presence of a specific organic factor judged to be etiologically related to the abnormal mental state and loss of previously acquired functional abilities.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
   A. Demonstration of a loss of specific cognitive abilities or affective changes and the medically documented persistence of at least one of the following:
      1. Disorientation to time and place; or
      2. Memory impairment, either short-term (inability to learn new information), intermediate, or long-term (inability to remember information that was known sometime in the past); or
      3. Perceptual or thinking disturbances (e.g., hallucinations, delusions); or
      4. Change in personality; or
      5. Disturbance in mood; or
      6. Emotional ability (e.g., explosive temper outbursts, sudden crying, etc.) and impairment in impulse control; or
      7. Loss of measured intellectual ability of at least 15 I.Q. points from premorbid levels or overall impairment index clearly within the severely impaired range on

27

---

neuropsychological testing, e.g., the Luria-Nebraska, Halstead-Reitan, etc.;
AND
B. Resulting in at least two of the following:
    1. Marked restriction of activities of daily living; or
    2. Marked difficulties in maintaining social functioning; or
    3. Marked difficulties in maintaining concentration, persistence, or pace; or
    4. Repeated episodes of decompensation, each of extended duration;
OR
C. Medically documented history of a chronic organic mental disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and one of the following:
    1. Repeated episodes of decompensation, each of extended duration; or
    2. A residual disease process that has resulted in such marginal adjustment that even a minimal increase in mental demands or change in the environment would be predicted to cause the individual to decompensate; or
    3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
20 C.F.R. Part 404, Appendix 1, Part A.


[23]   12.04 Affective Disorders: Characterized by a disturbance of mood, accompanied by a full or partial manic or depressive syndrome. Mood refers to a prolonged emotion that colors the whole psychic life; it generally involves either depression or elation.  The required level of severity for these disorders is met when the requirements in both A and B are satisfied, or when the requirements in C are satisfied.
    A.   Medically documented persistence, either continuous or intermittent, of one of the following:
        1.   Depressive syndrome characterized by at least four of the following:
            a. Anhedonia or pervasive loss of interest in almost all activities; or
            b. Appetite disturbance with change in weight; or
            c. Sleep disturbance; or

28

---

      d. Psychomotor agitation or retardation; or
      e. Decreased energy; or
      f. Feelings of guilt or worthlessness; or
      g. Difficulty concentrating or thinking; or
      h. Thoughts of suicide; or
      i. Hallucinations, delusions, or paranoid
      thinking; or
2. Manic syndrome characterized by at least three of
the following:
      a. Hyperactivity; or
      b. Pressure of speech; or
      c. Flight of ideas; or
      d. Inflated self-esteem; or
      e. Decreased need for sleep; or
      f. Easy distractability; or
      g. Involvement in activities that have a high
      probability of painful consequences which are not
      recognized; or
      h. Hallucinations, delusions or paranoid thinking;
OR
3. Bipolar syndrome with a history of episodic periods
manifested by the full symptomatic picture of both
manic and depressive syndromes (and currently
characterized by either or both syndromes);
AND
B. Resulting in at least two of the following:
1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social
functioning; or
3. Marked difficulties in maintaining concentration,
persistence, or pace; or
4. Repeated episodes of decompensation, each of
extended duration;
OR
C. Medically documented history of a chronic affective
disorder of at least 2 years' duration that has caused more
than a minimal limitation of ability to do basic work
activities, with symptoms or signs currently attenuated by
medication or psychosocial support, and one of the
following:
1. Repeated episodes of decompensation, each of
extended duration; or
2. A residual disease process that has resulted in such
marginal adjustment that even a minimal increase in
mental demands or change in the environment would be
predicted to cause the individual to decompensate; or

29

of the Listing of Impairments, 20 C.F.R. Part 404, Subpart p, Appendix 1, Part A. (R. at 207, 209.)  He opined that Mr. Pollard had mild restriction of activities of daily living, no difficulties in maintaining social functioning and moderate difficulties in maintaining concentration, persistence, or pace. (R. at 216.)  He concluded that Mr. Pollard's allegations regarding his limitations were credible, but not to the degree alleged, and that Mr. Pollard retains the ability to meet the basic mental demands of simple, unskilled work.  (R. at 218.)

On April 8, 2005, Dr. Kamin completed a Mental Residual Functional Capacity Assessment on Mr. Pollard. (R. at 223-25.) Dr. Kamin opined that Mr. Pollard had no significant limitation in his ability to remember locations and work-like procedures, to understand, remember, and carry out very short and simple instructions, to sustain an ordinary routine without special supervision, to work in coordination with or proximity to others without being distracted by them, to make simple work-related decisions, to interact appropriately with the general public, to ask simple questions or request assistance, to accept instructions and respond appropriately to criticism from supervisors, to get along with coworkers or peers without

---

3. Current history of 1 or more years' inability to function outside a highly supportive living arrangement, with an indication of continued need for such an arrangement.
20 C.F.R. Part 404, Subpart P, Appendix 1, Part A

distracting them or exhibiting behavioral extremes, to maintain socially appropriate behavior and to adhere to basic standards of neatness and cleanliness, to be aware of normal hazards and to take appropriate precautions, to travel in unfamiliar places or use public transportation, and to set realistic goals and make plans independently of others.  (R. at 223-24.)  Dr. Kamin opined that Mr. Pollard is moderately limited in his ability to understand and remember detailed instructions, to maintain attention and concentration for extended periods, to perform activities within a schedule, maintain regular attendance and be punctual within customary tolerances, to complete a normal workday and workweek without interruptions from psychologically-based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods, and to respond appropriately to changes in the work setting.  (Id.)  Dr. Kamin also opined that Mr. Pollard is markedly limited in his ability to carry out detailed instructions.  (R. at 223.)

d.   <strong>Dr. K. Kosty: Physical Medicine Consultant</strong>

At the request of the Social Security Administration, medical consultant, Dr. K. Kosty, prepared a Physical Residual Functional Capacity Assessment dated April 8, 2005, on Mr. Pollard, after reviewing his medical records.  (R. at 227-32.) Dr. Kosty opined that Mr. Pollard could occasionally lift and/or carry a maximum of twenty pounds, frequently lift and/or carry a

31

maximum of ten pounds, stand and/or walk (with normal breaks) for a total of about six hours in an eight hour workday, and was unlimited in his ability to push and/or pull (including operation of hand and/or foot controls).  (R. at 228.)  Dr. Kosty stated that she drew these conclusions from the following evidence: Mr. Pollard's left eye vision of 20/0 and his right eye vision of 20/20, the results of the echocardiogram which revealed a moderate concentric left ventricular hypertrophy, his controlled hypertension and his blood pressure of 180/88.  (Id.)  Dr. Kosty further opined that Mr. Pollard had no manipulative limitations, but that his vision was limited with regard to his far acuity and field of vision, due to blindness in his left eye.  (R. at 229.) In regards to the other symptoms Mr. Pollard alleged, such as headaches, neck and back pain, and difficulty with walking, sitting, lifting and carrying, Dr. Kosty believed that Mr. Pollard's statements were credible, but not to the degree alleged, considering that Mr. Pollard is capable of doing his own cleaning, shopping, cooking and traveling.  (R. at 230-31.)  Dr. Kosty adopted the opinion of Dr. Khona that Mr. Pollard has a mild to moderate limitation secondary to his medical conditions. (R. at 231.)

### D.   **Other Relevant Evidence**

In a Functional Assessment Questionnaire, filled out on October 31, 2003, Mr. Pollard stated that he experiences chest

pain when lifting heavy objects. (R. at 103.)  He also stated that he suffers from fatigue all the time and becomes light-headed when bending over.  (R. at 104.)  He noted that fatigue and light-headedness are side effects of his medications.  (Id.)  In an Adult Pain Report survey, Mr. Pollard also reported occasional cramps in his fingers and arms.  (R. at 110.)

In an Activities of Daily Living Questionnaire filled out on November 27, 2003, Mr. Pollard reported experiencing severe headaches and back spasms on a typical day.  (R. at 111.)  He also reported getting back spasms and pain if he lifts objects that are too heavy. (R. at 113.)

In his Disability Report Appeal, filed December 7, 2004, Mr. Pollard noted that he couldn't lift much or stand for long periods of time. (R. at 126.)  He also stated that he was tired all of the time.  (Id.)

In a Disability Report filed on January 26, 2005, Mr. Pollard reported that he did not sleep well, (R. at 141) he got dizzy, got many headaches, felt weak, had trouble concentrating and had back, neck, and head pain.  (R. at 141 - 45.)  He also stated that he could only walk about a block before having to stop to rest, and must rest for five minutes before continuing to walk.  (R. at 146.)  He claimed that stress brought on his headaches.  (R. at 149.)

In his Disability Report appeal dated May 5, 2005, Mr. Pollard complained that since he filed the last report, his eyesight had deteriorated further, his diabetes worsened, and he was more depressed.  (R. at 151.)  He also reported that Dr. Auerbach told him that his diabetes was worse and his blood pressure was high.  (R. at 159.)

Additionally, Mr. Pollard failed to attend two scheduled consultative examinations, dated May 28, 2004 and August 13, 2004, nor did he call to notify of his inability to appear at the examinations.  (R. at 115, 166.)

**III. DISCUSSION**

    **A.**   **Analysis**

           **1.**   **Whether the ALJ Properly Considered All the Evidence in the Record, Particularly the Claimant's Subjective Complaints of Pain and Fatigue**

Claimant argues the ALJ did not properly consider all the evidence in the record, specifically evidence of pain and fatigue, and thus erred in determining that his heart problems, hypertension, diabetes and depression do not constitute "severe impairments" at Step Two of the analysis.  (Pl.'s Br. at 9-12.) Defendant argues that based on substantial evidence in the record, the ALJ properly determined that, with the exception of

his limited left eye vision and mild mental retardation,[24] Mr.
Pollard does not suffer from a "severe" impairment that imposes
significant restrictions on his ability to perform basic work
activities.  (Def.'s Br. at 14.)  In reviewing the administrative
record, this Court finds that while there is substantial evidence
in the record to support the ALJ's credibility determination with
regard to Claimant's complaints of pain, the ALJ did not properly
consider Claimant's fatigue when evaluating the severity of his
impairments at Step Two.

     To establish that a "severe" impairment exists, a plaintiff
must show his impairment is more than a slight abnormality and
significantly limits his ability to work.  20 C.F.R. §§
404.1520(c); SSR 85-28.  SSA regulations explain that an
impairment that does not "significantly limit[] [the plaintiff's]
physical or mental ability to do basic work activities" does not
constitute a severe impairment.  20 C.F.R. § 404.1521(a).  Basic
work activities are "abilities and aptitudes necessary to do most
jobs, including, for example, walking, standing, sitting,
lifting, pushing, pulling, reaching, carrying or handling."

---

     [24]  The Defendant implicitly concedes that Mr. Pollard's
left eye blindness and mild mental retardation are "severe," and
thus that the ALJ did not err at Step Two, by arguing that Mr.
Pollard has not met his burden of proving that his conditions met
or equaled any section of the Listing of Impairments at Step
Three (R. at 17.)

Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) (quoting 20 C.F.R. § 140.1521(b)).

In determining whether an impairment is severe, the ALJ, as the ultimate finder of fact, must consider all the evidence in the record and may weigh the credibility of the evidence. Burnett, 220 F.3d at 122. However, if choosing to disregard evidence, the ALJ must provide an adequate explanation as to why it should be disregarded. See, e.g., Adorno v. Shalala, 40 F.3d 43, 43 (3d Cir. 1994) (vacating and remanding where ALJ failed to explain how plaintiff with asthma could return to job which included exposure to dust and fumes). When reviewing all the evidence with respect to a plaintiff's impairments, the ALJ must also consider symptom-related limitations and restrictions of medically ascertainable impairments which could reasonably be expected to produce the symptoms. See SSR 96-3p. SSR 96-3p further provides that:

> If the adjudicator finds that such symptoms cause a limitation or restriction having more than a minimal effect on an individual's ability to do basic work activities, the adjudicator must find that the impairment(s) is severe and proceed to the next step in the process even if the objective medical evidence would not in itself establish that the impairment(s) is severe.

In reviewing the ALJ's findings, this Court has a duty to review the evidence in its totality. Daring, 727 F.2d at 70.

a.        **Evaluating Subjective Complaints of Pain**

The record demonstrates that the ALJ properly weighed the available evidence in the record when making a determination that Mr. Pollard's complaints  regarding the severity of his pain were not entirely credible in light of the inconsistencies between the medical evidence and his testimony.  The ALJ is required to give serious consideration to Plaintiff's subjective complaints of pain.  Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986). However, "it is well established that the ALJ has discretion to evaluate the credibility of a claimant and to arrive at an independent judgment, in light of medical and other evidence, regarding the true extent of the pain alleged by the claimant." Brown v. Schweiker, 562 F. Supp. 284, 287 (E.D. Pa. 1983) (quoting Bolton v. Sec'y of HHS, 504 F.Supp. 288, 291 (E.D.N.Y. 1980)).

An example of a valid credibility determination is an ALJ's consideration of the fact that a claimant has not sought medical treatment for pain, Mason v. Shalala, 994 F.2d 1058, 1068 (3d Cir. 1992), or that a claimant is not taking medication that was prescribed for pain.  Welch, 808 F.2d at 270.  While an ALJ may look at a claimant's stated ability to engage in hobbies, cooking, and driving in determining that the complaints of pain are not credible, activities such as school, hobbies, housework, or use of public transportation cannot be used to show ability to engage in substantial gainful activity.  Frankenfield v. Bowen, 861 F.2d

405, 408 (3d. Cir. 1988); Smith v. Califano, 637 F.2d 968, 971 (3d Cir. 1981) ("Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity."). See also 20 C.F.R. § 404.1572(c) ("Generally, we do not consider activities like taking care of yourself, household tasks, hobbies, therapy, school attendance, club activities or social programs to be substantial gainful activity.").

In any case, the ALJ must indicate the basis for conclusions that the claimant's testimony is not credible. See generally Cotter v. Harris, 642 F.2d 700 (3d Cir. 1981). Where an ALJ properly determines the credibility of Claimant's subjective complaints of pain, the reviewing court should not substitute its own determination of credibility for that of an ALJ who had the opportunity to observe a plaintiff in person. See Weir v. Heckler, 734 F.2d 955, 962 (3rd Cir. 1984) (recognizing that great deference is given to an ALJ's determination of credibility).

Subjective complaints of pain "do not in themselves constitute disability." Green v. Schweiker, 749 F.2d 1066, 1070 (3d Cir. 1984); 20 C.F.R. § 404.1529(a).  Complaints of pain must be accompanied by medical signs that show that the plaintiff has a medical impairment that could reasonably be expected to produce the pain or other symptoms alleged.  20 C.F.R. § 404.1529(a) (explaining that "statements about your pain or other symptoms

will not alone establish that you are disabled"). See Bittel v. Richardson, 441 F.2d 1193, 1195 (3d Cir. 1971) (requiring plaintiff to meet burden of showing medical impairment to support subjective complaints of pain). When a plaintiff's subjective complaints of pain indicate a greater severity of impairment than the objective medical evidence supports, the ALJ can give weight to factors such as physicians' reports, lay opinions and the plaintiff's daily activities. 20 C.F.R. § 404.1529(c)(3); SSR 96-7p (requiring the ALJ to "consider the entire case record and give specific reasons for the weight given to the individual's statements").

In this case, the ALJ carefully considered Mr. Pollard's subjective complaints of pain by examining his testimony about pain alongside all the medical evidence. (R. at 20-21.) In doing so, the ALJ found that despite Mr. Pollard's testimony that he had difficulty walking down steps because one leg wouldn't bend and had cramping in his fingers when grabbing an object, during his examination by Dr. Khona, Mr. Pollard never complained of any foot or knee problems and no difficulties were discovered. (R. at 20). A strength test further revealed that Mr. Pollard's grip was full bilaterally with a rating of 5/5. (R. at 20.) Additionally, the ALJ noted that in filling out his Adult Pain Report, Mr. Pollard only reported having cramps "sometimes in his fingers." (R. at 21.)

In addition to noting the inconsistencies between Mr. Pollard's testimony and his medical records, the ALJ focused on several other factors that he felt negatively impacted Mr. Pollard's credibility.  These included Mr. Pollard's testimony at the hearing that he suffered from headaches as compared with his denial of experiencing headaches during his consultative examination with Dr. Khona, his failure to timely retain refills for his medication, his failure to attend two consultative examinations or to notify anyone regarding his absence, and finally his refusal to undergo a recommended X-ray of his lumbrosacral spine.  (R. at 120-21.)

Although the ALJ concluded that Mr. Pollard's medical impairments could be expected to produce the symptoms he alleges, the ALJ did not believe that Mr. Pollard was fully credible, and instead found that his complaints suggested a greater severity of impairment than could be supported by the medical evidence in the record. (R. at 20.)  Because the credibility determination was based on the medical evidence in the record, the ALJ properly considered the subjective complaints of pain, and his findings are entitled to deference by this Court.  <u>Weir</u>, 734 F.2d at 962.

### b.    Evaluating Subjective Complaints of Fatigue

In evaluating the severity of Mr. Pollard's impairments, the ALJ improperly disregarded evidence relating to Mr. Pollard's fatigue.  Evidence in the record shows that fatigue reasonably

could have been expected to be either a symptom of Mr. Pollard's depression or heart problems, or a side effect of one of his medications. (R. at 197, 201-02).

The ALJ summarily dismissed Mr. Pollard's complaints of fatigue, stating that, "while the claimant . . . reported in the record that he is tired and fatigued, the medical evidence fails to support his physical allegations of disability." (R. at 21.) In so doing, the ALJ did not review the available evidence that supported Mr. Pollard's claim, nor did he give adequate reasons for rejecting that evidence. Like complaints of pain, complaints of fatigue are also subjective, and thus it is proper to perform an analogous analysis, determining to what extent fatigue might limit Mr. Pollard's ability to perform basic work functions, and thus impact on the severity of his impairments. See SSR 96-7 (describing "a three-step process for evaluating symptoms such as pain [and] fatigue."); see also Blakeman v. Astrue, 509 F.3d 878, 879 (S.D. 2007) (noting that fatigue must be considered when alleged by claimant and when a medically determinable impairment could reasonably be expected to produce that symptom).

A review of the record establishes that there is evidence of Mr. Pollard complaining of fatigue as early as October of 2003 in a Functional Assessment Questionnaire. (R. at 104.) Mr. Pollard has consistently continued to express similar general complaints of fatigue, as well as difficulty sleeping and difficulty standing

41

or walking for long periods of time.  He raised these complaints in his Disability Appeal Report in December 2004 (R. at 126,) his Disability Report filed in January 2005 (R. at 141), and in his testimony before the ALJ. (R. at 264, 267, 273.)  During his hearing, Mr. Pollard testified that while he has difficulty sleeping at night, only sleeping for about three to four hours (R. at 274), he often falls asleep while sitting (R. at 273) and estimates that he sleeps four to six hours during the day. (R. at 284.)  Mr. Pollard's sister, Bertha Hyman, also testified that Mr. Pollard falls asleep often and is unable to walk very far before he must stop to rest. (R. at 279-80.)

In addition to such non-medical evidence, there are numerous instances where Mr. Pollard's complaints of fatigue has been noted in his medical records by examining physicians.  In 2003, Mr. Pollard's treadmill stress test was stopped in part due to fatigue.  (R. at 186.)  In February of 2005, during a consultative examination, Dr. Khona noted in his report that Mr. Pollard chiefly complained of chronic fatigue, difficulty sleeping, and depression.  (R. at 194.)  He further observed that Mr. Pollard had difficulty keeping his eyes open during the exam.  (Id.) and opined that Mr. Pollard's fatigue could be due to his heart problems.  (R. at 197.)  Likewise, in March of 2005, Dr. Moore, a licensed psychologist who performed a consultative organicity and psychiatric evaluation on Mr. Pollard, opined that Mr. Pollard's

vocational difficulties were caused in part by medication-induced fatigue, and further noted that Mr. Pollard reported difficulty sleeping and symptoms of depression, including fatigue.  (R. at 201-02.)

Despite the above cited evidence, the ALJ failed to properly evaluate evidence of fatigue, a documented, symptom-related limitation of Mr. Pollard's impairments.  The ALJ never discussed how the fatigue impacts or limits Mr. Pollard's ability to perform basic work activities.[25]  Although the ALJ retains the discretion to make credibility determinations in light of the medical findings and other evidence as to the true extent of the claimant's fatigue, in this case, the ALJ completely failed to address the medical evidence of fatigue because he found the claimant to be generally not credible, and thus erred at Step 2 of the sequential analysis.

---

[25] Because the ALJ never considered Claimant's fatigue at Step Two, his analysis was also flawed at Step Four with regard to determining Mr. Pollard's residual functional capacity.  In accordance with 20 C.F.R. §§ 404.1545, 416.945, the ALJ must conduct a function by function assessment of the Claimant's ability to perform work-related functions on a regular and continuing basis.  This involves considering limitations imposed by an individual's impairments, even those that are not severe, as well as the effects of symptoms reasonably expected to be produced by those impairments.  SSR 96-8.  Thus, regardless of whether the ALJ determines on remand that Mr. Pollard's hypertension, diabetes, depression and heart problems are severe impairments at Step Two, the ALJ must consider each of those impairments, as well as the symptom of fatigue, which is reasonably expected to be produced by those impairments, when determining the Claimant's RFC at Step Four.

2.        **Whether the ALJ Substituted His Judgment For**

**That of the Treating Physician**

_____The ALJ correctly rejected the ultimate opinion of Mr.
Pollard's treating physician, Dr. Auerbach, that Mr. Pollard is
totally and permanently disabled, due to the lack of supporting
objective clinical findings and inconsistencies found within Dr.
Auerbach's medical records. (R. at 18.)  Mr. Pollard argues that
the ALJ erred in not giving controlling weight, or at least
deference, to Dr. Auerbach's opinion, which he claims is supported
by evidence in the record.  (Pl.'s Br. at 22-23.)  Defendant
argues that the ALJ was not required to afford controlling weight
to the treating physician's opinion, because whether an individual
meets the statutory definition of disability is a dispositive
administrative finding reserved for the Commissioner.  (Def.'s
Brief at 24.)  This Court agrees with Defendant's position on this
issue.

A treating physician's medical opinion will be given
controlling weight when it is "well supported by medically
acceptable clinical and laboratory diagnostic techniques and is
not inconsistent with the other substantial evidence in [the] case
record."  20 C.F.R. § 416.927(d)(2).  Otherwise, the credibility
of non-controlling medical evidence is evaluated by considering:
(1) length of relationship and frequency of examination, (2)
nature and extent of treatment relationship, (3) supportability of

44

opinion in terms of the prevalence of medical signs and laboratory findings, (4) consistency with other medical evidence, (5) specialization of medical source, (6) other factors to include familiarity with the disability standards and procedures.  20 C.F.R. § 416.927(d)(1)-(6).  Indeed, the opinion of a treating physician is entitled to more weight than a one-time consultative examiner because treating physicians

> are likely to be the medical professionals most able to provide a detailed, longitudinal picture of [a Claimant's] medical impairment(s) and may bring a unique perspective to the medical evidence that cannot be obtained from the objective medical findings alone or from reports of individual examinations, such as consultative examinations or brief hospitalizations.

C.F.R. § 404.1527(d)(2); see Adorno, 40 F.3d at 48.  This is particularly true "when the opinion reflects an expert judgment based on a continuing observation of the patient's condition over a prolonged period of time." Rocco v. Heckler, 826 F.2d 1348, 1350 (3d Cir. 1987) (internal quotations omitted).

However, the Commissioner retains the responsibility of determining administrative findings that are dispositive of the case,  20 C.F.R. §§ 404.1527(e), 416.927(e), including residual functional capacity, whether an impairment meets the Listing of Impairments, and whether an individual meets the statutory definition of disability.  20 C.F.R. §§ 404.1527(e)(1)-(2), 416.927(e)(1)-(2).  Moreover, an ALJ can reject the opinion of a

45

treating physician on a medical as opposed to a legal conclusion, if the ALJ explains on the record the reasons for doing so.  See Allen v. Bowen, 881 F.2d 37, 41 (3d Cir. 1989).  The ALJ must also indicate the basis for concluding that a doctor's report is not credible. Cotter, 642 F.2d at 706-07.

The ALJ rightly rejected Dr. Auerbach's opinion regarding Mr. Pollard's status as disabled.[26]  Not only was the doctor's conclusion an administrative finding reserved for the Commissioner, but it was also unsupported by evidence in Dr. Auerbach's own records.  Furthermore, Dr. Auerbach gave no explanation for the basis of opinion, nor can a proper basis be inferred.

Although Dr. Auerbach documented Mr. Pollard's problems with hypertension and diabetes, he never gave any indication of how these problems impacted Mr. Pollard's ability to function either inside or outside the workplace.  (R. at 169-85.)  Moreover, at an office visit on January 19, 2005, Dr. Auerbach noted that Mr. Pollard's diabetes was improving and his hypertension was controlled.  (R. at 169.)  Additionally, Dr. Auerbach does not appear to document any problem with chronic fatigue or pain, nor any difficulty with walking or standing.

---

[26] Dr. Auerbach's opinion was expressed through notations in Mr. Pollard's medical records on September 17, 2003 and November 17, 2003.  (R. at 173, 178.)

Because this treating physician's opinion regarding Mr. Pollard's disability was an administrative finding reserved for the Commissioner and is both unsupported and contradicted by the treating physician's medical records, the ALJ was not required to give his opinion deference.


**IV.   <u>CONCLUSION</u>**

For the reasons stated above, this Court shall remand to the ALJ for reconsideration and evaluation of evidence of Claimant's fatigue and its impact on the severity of his impairments at Step Two and on his ability to perform work-related functions at Step Four of the analysis.  The accompanying Order on remand is entered.


**<u>March 6, 2008</u>**                    **<u>s/ Jerome B. Simandle</u>**
DATE                                 JEROME B. SIMANDLE
                                     United States District Judge

47